This first case, and then once we complete it, we'll take a short recess because we'll have a panel change, and Judge Haynes will come in, and Joe and Judge Clement and I, and then we'll mow through the rest of the docket. So we'll proceed in that order. All right, I believe that we've got veterans at the council table, so I won't belabor the point on the rules, but one of the ones that seems to get missed is moving outside of that microphone. We do record the proceedings, so it's very important you keep your voice up and talking to the mic so we can hear you as well as pick it up. And the other thing is just making sure you answer the court's questions. That's your primary reason for being here is to help us understand the case better. With that said, the first case, Saenz v. Flores et al. Mr. Dornell, you're up. May it please the court, counsel, we are here as a result of an incident that occurred in El Paso, Texas on March 18, 2013. It was an unfortunate incident in which a man by the name of Daniel Saenz was shot by an exhausted and physically overwhelmed El Paso police officer, Jose Flores. The cases you will hear this morning have a little bit of a unique procedural history. The city of El Paso, whose appeal at least some members of this panel already heard, and Officer Flores are here on appeal from the second amended complaint, while Mr. Romero is here on a motion to dismiss the fourth amended complaint. In our case, the preliminary question before the court is what pleadings of the plaintiff should this court consider in deciding de novo the merits of Flores' motion to dismiss based on qualified immunity. Certainly the court can consider plaintiff's second amended complaint. It should also consider plaintiff's opposition to Flores' motion to dismiss. Included within that opposition was an offer of proof, and I say that with quotes because it was entitled offer of proof. The added three pages of the El Paso Civil Service Commission's take on Mr. Flores' employment and their spin on what he had said in their statements to him. In this case, we believe that this panel should also consider plaintiff's opposition to the city of El Paso's motion to dismiss. The motion to dismiss against the city of El Paso was filed December 11, 2014. The opposition to Romero or Flores' motion to dismiss was filed December 12, 2014. What's the essence of that you want us to consider? What the essence of that, Your Honor, is that attached to that was a seven-page sworn statement from Officer Flores himself. And we believe that under Newman v. Kunstner, which is a First Circuit case, that the court is able to consider that, and we would ask this court to adopt the reasoning of the First Circuit and consider facts susceptible to judicial notice. And clearly, these are susceptible of judicial notices. They are contained within the record on appeal. What's the core of his message in the affidavit that you want us to take into account in that as it relates to the main question? The core of his message is that before he met Mr. Sines, he learned that he had been arrested at Del Sol Medical Center because he had assaulted four people. He had assaulted an elderly man, a police officer, and two elderly people. It took three officers, including two SWAT officers, to take him down. Mr. Sines was tased five times with little to no effect during that takedown. He was taken to the El Paso County Detention Facility, and Officer Flores saw that he was short, but he was a 270-pound bodybuilder. He also saw that Mr. Sines was sliding the handcuffs from back to front to back without any problem. And as a result, Officer Flores knew that he was in for a long afternoon. He knew that he was going to be with a G4S security guard. He didn't know what his training was, so he felt like he was in charge. Were there other officers in the immediate area where he was shot who could have come to the officer's assistance? Yes, ma'am. There should have been. There were probably 400 detention officers within the El Paso County Detention Facility, none of whom responded. Where they were was on monitor by several cameras. It was unmonitored? It was monitored. It was monitored by camera. There were people watching, and nobody came through that door. Why, I don't know. Were the officers hollering for assistance? I don't know. The videos that I have seen are just video. You can't tell. Is this area secure? No, it is not secure. This was in the sally port, and the sally port is outside the facility. It goes from street level down to a basement level, but it is just a driveway. And they were in the sally port when the actual struggle took place, when Mr. Sines grabbed Officer Flores's crotch, when he took his hands and bent them back, when he lifted both of these officers off the ground in an attempt to injure them. And finally, Officer Flores, who by that time was exhausted, stepped back, started, touched his taser, but realized that wasn't going to work, and then pulled his service revolver. And as he pulled his service revolver, it went off. That's as far as we can go with the statements that I've got on the pleadings. Is there any indication that the prisoner was reaching for the service revolver? There is indication that he had reached for it previously, but not at the time because Officer Flores disengaged and stepped back. He was exhausted, and his attempt was to get control of the situation. With his gun? Well, hopefully to use his gun to tell Mr. Sines to stand down. That was his intent. Thank you. All right, Mr. Darnielle, you've reserved a little rebuttal time to come back up. All right, Mr. Ortega.  May it please the Court. My name is Francisco Ortega, and I represent Alejandro Romero, who is the other appellant in this consolidated appeal. In this case, the district court granted in part and denied in part Mr. Romero's motion to dismiss. Specifically, the district court in this case found in part that Mr. Romero had failed to properly invoke the doctrine of qualified immunity in his motion to dismiss. However, contrary to the district court's finding, Mr. Romero did properly plead and invoke the doctrine of qualified immunity in his motion to dismiss as found on pages 1169 through 1173 of the court's record. In his motion to dismiss, Mr. Romero repeatedly invoked and alleged that he was entitled to qualified immunity arising out of the excessive force claims alleged by plaintiffs in her Fourth Amendment complaint. He outlined the test for qualified immunity. He explained what that test is as it applies to him as a private citizen who is working hand in glove with the El Paso Police Department in the transportation of detainees. He cited Filarski v. Delia, which is a United States Supreme Court decision, applicable in this case. He also alleged in his motion to dismiss that there is a firmly rooted history and policy in our nation of affording qualified immunity to individuals like him who are working in close coordination and at the request of law enforcement when they're performing duties that have been traditionally performed by public actors. Mr. Romero also in his motion to dismiss acknowledged that he was acting under color of state law. He admitted that he was acting as a joint participant and was in a position of interdependence with the city of El Paso and the El Paso Police Department in the transportation of detainees. In his motion to – in his response, did he otherwise, in addition to what you're saying he cited, did he otherwise cite to any contractual provisions relative to his company and the facility which spoke to or not this question of sort of sameness of a law enforcement official? He acknowledged, Your Honor, in his motion to dismiss that there was in fact a contract, as the court indicated, between the city of El Paso and G4S Secure Solutions, which is Mr. Romero's employer at the time, that allowed Mr. Romero to assist the city of El Paso in that position of interdependence to transport detainees from one detention facility to another. But he never acted alone. He always acted in close coordination with the El Paso Police Department. He considered Officer Flores, who was a police officer at the time, as his supervisor. He was acting at the request of the city pursuant to that contract in transporting detainees. He cited in his motion to dismiss several cases from other federal courts in the country that had afforded immunity to private jailers, to private security guards, who were engaged in duties that had been traditionally performed by public actors. More importantly, Your Honors, Mr. Romero argued throughout his motion to dismiss that Mrs. Saenz had failed to plead sufficient plausible facts in her Fourth Amendment complaint to show that there had been a violation of a constitutional right. He argued that the video that was attached and incorporated to the Fourth Amendment complaint contradicted the facts as alleged in the Fourth Amendment complaint. The video shows Mr. Romero assisting Daniel Saenz because, according to the Fourth Amendment complaint, he couldn't walk on his own, he was unconscious, he was bleeding. Mr. Romero did what a reasonable officer would have done under the same circumstances. Because Mr. Saenz couldn't walk, he was unconscious, he was in desperate need of urgent medical care, he transported Daniel Saenz to the medical unit, and that's shown in the video. Mr. Romero repeatedly alleged in his motion to dismiss that those actions as depicted in the video contradict the allegations in the Fourth Amendment complaint. And that's the first prong of a qualified immunity test in a motion to dismiss stage. The plaintiff has to show sufficient facts to make a claim of a violation of a constitutional right. She failed to do so in this case. So with all that, what was the district court missing? I'm assuming the same argument you're making to us you made to the district court with all the pertinent documents, etc., etc. So where did it go off track from your vantage point? What was missing here? The error, Your Honor, that the district court did is it failed to consider the merits of Mr. Romero's qualified immunity argument. It didn't reach the merits. It stopped short and found that Mr. Romero had failed to properly invoke qualified immunity. It relied on a Fourth Circuit case, Sales v. Grant, which is completely distinguishable from this case. It's a case that dealt with the timing of qualified immunity, not the substance or form. Right. Well, I inaptly stated my question. I got that part in terms of the district court never went there, went to that issue of merits. But I'm saying in light of what you're arguing vis-a-vis the invocation of qualified immunity and the response, etc., where the district court gets sidetracked on that. Was it the argument it went to the merits and sort of glided over that or what? Or was there something else that's argued here that wasn't argued there? On the point of this, Mr. Flores being the tantamount to being the supervisor, that at all times they were joined at the hip in terms of what they were doing, etc. The argument you're making is because this isn't just prototypical qualified immunity because it's not an El Paso. So it doesn't just jump out that he's automatically entitled. So I would assume some push was made on this point so it wouldn't be missed, and that's sort of what I'm asking. If I understood the court correctly— You're saying he looked at the wrong cases? Is that what you're saying? With respect to the invocation of qualified immunity, yes. He did not rely on decisions from this circuit. He relied on the Fourth Circuit, which was a case that dealt with when qualified immunity was alleged. In that Fourth Circuit case, Sales v. Grant, qualified immunity was invoked after the case was remanded on appeal. That's not this case. Mr. Romero immediately and appropriately invoked qualified immunity in this test. For that reason, Mr. Romero respectfully asked the court to reverse the district court's order, and if the court does not want to reach the merits of the qualified immunity argument, it could simply remand the case to the district court to allow the district court to rule on the merits. Thank you, Your Honors. Thank you, sir. All right. Mobs or Mobs? How do you pronounce it? Mobs. Mobs, all right. Sir, you're up. Thank you. May it please the Court. My name is John Mobs, and I represent the Appalachian Miss Science in this case. I'll begin at the end with Mr. Romero's appeal. The court should affirm the district court's order denying his motion to dismiss because a person in Mr. Romero's position as an employee of a privately contracted entity under a contract with the city for transportation of prisoners is just not entitled to qualified immunity at all. And the reason is, as described in the Supreme Court's opinion in Richard— Not the merits issue, but the point before getting there is whether or not that question was not reached. Because of the invocation issue. If we were to hold that the district court was correct, that it wasn't invoked, we might go down one path. On the other hand, before getting to the merits of this question, was it properly invoked? Did the district court's ruling comport with what our case law says needs to be done? I think the district court did that respectfully. I don't think it's accurate to say the district court did not reach this issue. The district court did say that qualified immunity was not properly invoked as to the claim for the use of excessive force by Mr. Romero in dragging Mr. Science around the jail. But the court went on to address the substance of the arguments made. And in reading the motions, the district court interpreted the many references pointed out to you at oral argument to refer instead to a different claim, to a claim based on just the use of double handcuffs and not the claim for dragging Mr. Science around the jail, including by use of the handcuffs. So the district court said, well, immunity is not properly invoked as to the claim that's actually asserted, the claim for dragging Mr. Science around the jail. However, the court reviewed the video, and the court said— The thing is you didn't argue that. The district court sua sponte determined a lack of invoking this, right? So you weren't pressing that the qualified immunity was not invoked. You were moving along in terms of dealing with the merits, right? Is that correct or not? That is correct. All right. Yes. Okay. Yes. But I will say on appeal there's not an issue presented asserting that the district court failed to reach the merits and should have reached the merits, because the district court did reach the merits. And the district court watched the video. And the district court said, well, based on the video, I don't see that it contradicts the complaint. I don't see that it necessarily affirms the complaint. But it's not sufficient to establish Mr. Romero's intent, which is the basis on which he claims qualified immunity. But the more fundamental question, I think, is whether a person in his position under a private contract may claim qualified immunity at all. And the answer is, under Richardson v. McKnight, he may not. And the reason, as Richardson explained, is that Section 1983 by itself on its face doesn't include an immunity defense. The reason qualified immunity is a defense in these cases is because there's such a firmly established common law tradition of affording immunity to public actors, to police officers and others, that Congress, if it had intended to repeal that immunity under Section 1983, would have said so explicitly. So we determine from the absence of any explicit revocation of qualified immunity that Congress must have intended to allow this doctrine to continue to exist under Section 1983, as it's applied to public employees. With respect to private persons performing traditional government functions, like Mr. Romero, the analysis is a little bit different. And we have to look first to whether there's a firmly rooted tradition of granting immunity to private persons under government contracts doing this job, to decide whether he may be entitled to immunity or not. And in this case, Mr. Romero is not entitled to claim qualified immunity, because there just is no firmly rooted common law tradition of granting immunity to persons employed under private prisoner transportation contracts. There's only one case that either party has found that's right directly on point. It's a California district court case from 2008, Sundquist v. Phelps, and that court did hold that there's no immunity for private prisoner transportation contractors. Mr. Romero has argued that, well, I'm relying on the established common law tradition of granting immunity under the posse comitatus doctrine. There are a couple of flaws with his reliance on that doctrine in his case. The one court that really analyzes that doctrine, I think, in determining whether there's a common law tradition of immunity, is a case cited in the appellant's brief, in the appellant's reply brief, Mejia v. City of New York. It's a New York district court case from 2000. And that court went through and analyzed the body of case law up to 1912 to decide whether this tradition of immunity existed under the posse comitatus doctrine, and it found a complete split. There were 12 or 14 decisions. There were 14 decisions, seven on one side, seven on the other side. Texas actually had cases on both sides. So because that split existed, there's not a firmly rooted or well-established tradition of immunity, such that we can fairly say that Congress, if it had intended to abrogate that immunity, would have explicitly said so. It's just a split. Some cases go one way and some cases go the other. Secondly, and I think maybe more fundamentally, Mr. Romero is not similarly situated to persons who may be chosen by a peace officer to participate in a posse because he was employed under a term service contract. This wasn't a one-time event where a member of the public was requested by a police officer for his assistance in apprehending a criminal or a suspect. So although it may be reasonable to expect a person who's brought in by a peace officer for his assistance on a one-time occasion to follow the officer's directions and to be protected from liability for providing unquestioning assistance to a peace officer, that's not the same situation as Mr. Romero, who was employed under this contract, whose decisions can be governed by terms of a contract or by employer policies that can dictate the terms of his relationship or interdependence with the police department. That's a distinction that the Supreme Court recognized in the Falarski case. Falarski involved an individual attorney who was employed by, I believe it was the city, for one-time assistance in connection with an employment issue and execution of a warrant. And in that case, the Supreme Court specifically referred to this posse comitatus doctrine and immunity being granted to individuals who are engaged in public service on a temporary or occasional basis. And again, that's different from Mr. Romero, who's engaged as a permanent full-time employee under this contract. The only similarity between the tasks performed by Mr. Romero and the tasks engaged in by members of a posse is that he held a prisoner in custody. And to that extent, Mr. Romero is no different than the prison guards who were employed under the prison contract that was at issue in Richardson. And the Supreme Court, of course, held that those prison guards are not entitled to qualified immunity. So because he doesn't fall within the class of persons entitled to claim immunity in the first place, the district court properly did not dismiss the claims against him under the qualified immunity doctrine. In Richardson and in Filarski, the Supreme Court also directs us to examine the policies underlying qualified immunity in deciding whether a privately employed individual may claim that defense. And what the Supreme Court explained in Richardson is that when a person is employed under a long-term contract like this, market forces are adequate to satisfy the purposes of qualified immunity. And the court talks at length in Richardson about those purposes, but what it really comes down to is we need government employees and government agents to be able to do their jobs and to exercise their judgment without fear of being sued at some later date. But when a person is employed under a private contract, they're going to do their job. We can trust that they're going to do their job because they're contracted to do their job. And if they're distracted from doing their job because of some fear of future litigation, they'll be replaced by another contractor or the contractor will replace the employees who refuse to do their jobs. They don't have the same civil service restrictions that the government often has. A private employer can provide insurance in a way that the government often cannot. And in Richardson, the Supreme Court said that those market forces are enough to satisfy the purposes of qualified immunity when you have someone like Mr. Romero who's working under a long-term government contract. So I think Richardson and Filarski are strange because they analyze both the public policy issue and the tradition issue, and in one case they found there was a tradition, in one case they found there was not a tradition, but in both cases they found it necessary to go on and address the policy question, which I think raises the question of, well, if there is no established common law tradition, can we create an immunity anyway when it's supported by public policies? And it's holding in Richardson, the Supreme Court wrote that there were no special reasons significantly favoring an extension of governmental immunity to the prison guards in Richardson. And that suggests to me that if there are special reasons that significantly favor an extension of immunity, you might get there even though there's not a well-established common law tradition. But in this case, again, with the controlling market forces described in Richardson equally applicable, there are just no such special reasons. I'll turn to the merits of Mr. Romero's arguments. His issue 2B argues that he's entitled to qualified immunity because he did not apply force or excessive force to Mr. Sines with the sadistic or malicious intent to cause harm to him. The Supreme Court in 2015 held, well, that's not the right legal standard on the first stage of the Saussure analysis. In Kingsley v. Henderson, the court resolved a circuit split and held no, the standard is an objective standard, that is whether the force applied is excessive to the proper purpose of the application of force. In order to try to overcome Kingsley, which I think Mr. Romero fairly concedes is inconsistent with his argument, he argues that Kingsley should not be applied retroactively. That was a 2015 decision. These events occurred in 2013. I think that contention is answered by this court's decision in Rankin v. Clevenhagen. It's a 1993 decision. In that case, the court had to deal with the question of whether you apply constitutional law retroactively or whether you apply currently existing law or then existing law at the first stage of the Saussure analysis, and the court held very clearly that you apply then existing law at the first stage. And I think the reason is, you know, the first question under Saussure is, did the defendant violate the plaintiff's constitutional rights? And, you know, obviously our understanding of the Constitution is always evolving. You may have a situation where a defendant- Always evolving. That may be your version. I'm sorry? Wonderful. It's not evolving. That may be your version. I heard the first part, but I didn't hear the first part. My ears are still slightly popped. I don't think constitutional rights are always evolving, as you said. I think our understanding of constitutional rights is evolving, and it was what I intended to say. Maybe yours. Mine is, for sure. Okay. You know, Kingsley is an example. You know, prior to Kingsley in this circuit, the understanding was that an excessive force claim could not exist in this context without force being sadistically and maliciously applied. After Kingsley, it's the understanding that that is not required. But in Rankin, the course that we apply currently existing law, you could have a situation where a person committed an act that everyone or every reasonable person would have understood was unconstitutional, but the Supreme Court clarified our understanding of the law after that act to say, no, that's not unconstitutional. A person wouldn't be held liable under Section 1983 or could have qualified immunity under Section 1983 because a change in the law would clarify- or a change in our understanding of the law would clarify that that action was in fact constitutional or, in fact, did not violate a constitutional right. I'll turn to Mr. Flores' issues, unless there are any other questions about Mr. Romero's issues. For Mr. Flores, the qualified immunity analysis is constrained because he did use deadly force against Mr. Sines. And as the courts explained, this court in Flores v. City of Palacios and Bazan v. Hidalgo County and the Supreme Court in Tennessee v. Garner, deadly force is unconstitutional unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm, that's death or serious physical injury to the officer or others, and that threat must be imminent. It must exist at the moment of the application of deadly force. The facts as pleaded by Mr. Sines are that Mr. Sines was restrained and handcuffed and face down on the ground. He was injured and bleeding. He couldn't flee. He couldn't get up to run because his pants were falling down around his ankles. He was in shoes without laces. He was on the ground struggling but not using any force. Obviously, he was not armed. He'd been under arrest for a period of time. The officers knew he was not armed. And, again, he was handcuffed with his hands behind his back. Other officers were available according to the pleading. And if those facts are true, and they must be taken as true in this review of the denial of 12B6 motion, Mr. Sines did not pose an imminent threat of serious bodily harm or death to Officer Flores or to others, and, therefore, the application of deadly force was unconstitutional. I think the most analogous recent case is Ramirez v. Martinez. It's a case from this court in 2013. It's not a death case. It's a case in which an officer used a taser against an arrestee. In that case, the plaintiff was struggling on the ground, pulled away from the officer's grasp, but this court said that force or that conduct in struggling and pulling away from the officer was not sufficient to show a threat to the safety of the officer or others. To justify even the force used by that officer in that case in using his taser as opposed to his service weapon. And, therefore, the officer in that case was not entitled to qualified immunity. Officer Flores also was not entitled to immunity. His principal argument in this appeal really just asks this court to take his version of the facts as true and his story as true. He points to his statement, which is in the record. Also in the record is the El Paso Civil Service Commission's investigation, which considered that statement and pointed out, given inconsistent statements at different times, that his conduct was not consistent with what he claimed in the statement. I don't know that the court needs to consider all of those materials in reviewing a denial of a 12B6 motion in which the statement of the complaint must be taken as true. Even if the court reads that statement, in this context, the court can't resolve disputed facts in determining whether eventually his version of the facts may be accepted by a jury. And so Officer Flores is also not entitled to reversal of the denial of his 12B6 motion. Are there any other questions? Thank you, sir. Thank you. All right. We're back to you, Mr. Darnell. Brief rebuttal. Thank you. Mr. Mobs pointed out that the complaint and the attachments to the complaint don't agree, and it's sort of the opposite of a summary judgment where you try to create a summary judgment with your own fact situation. But this situation has arisen before. The Seventh Circuit in Phillips v. Prudential Insurance Company of America determined that when an exhibit contains information that conflicts with the complaint, the exhibit takes precedent. What do you do with the pleading standard? I mean, you're on 12B6. We are on a 12B6. So you're sending us toward looking at allied documents, et cetera, et cetera. It was a 12B6. So what do you do with the standard? I mean, I got your argument about what else was pled and looking at the affidavit, but what do you say just about the pleading standard in this context, particularly our line of cases? I think the pleading standard still applies, but I think what plaintiff has done in this case is expanded the universe of pleadings to include all of these documents that have been attached as offers of proof or for whatever reason. I'm not sure why the documents were attached on a 12B6 motion, but when plaintiff attached those documents, I think they become part of plaintiff's story, and when they become part of plaintiff's story, they become part of his pleadings, her pleadings, and at that point the same standard would apply. But in this case, the attachments take precedence over the pleadings. If you're at this stage and it's construing the facts, you know, in the affidavit, et cetera, there's a difference of thought about that. So in that running counter to, at the 12B6, construing the facts and the like, not that they're what the end ought to be, but isn't that still there? You seem to be arguing that the court should have looked at these other documents and decided those issues in favor of your client. Yes, Your Honor, except that these are all plaintiff's pleadings. I could not do that. I could not put those pleadings before any court on a 12B6 or similar motion, but when plaintiff attaches those pleadings, it adopts them for whatever purpose, and as the Seventh Circuit has said, at that point the attachments take precedence over the pled story. Weren't they reviewed and accepted by the district court? They were reviewed without comment. That's about all I can say. Thank you. Thank you. Mr. Ortega. Your Honors, Counsel for Apelli advised the court that the district court had supposedly ruled on the merits of Mr. Romero's qualified immunity argument. That's not the case. In fact, on page 1282 of the court's record, the court specifically said, consequently, the court need not and indeed will not rule on Defendant Romero's dual propositions that he is entitled to qualified immunity based on his status as a joint state actor. The court did not reach the merits of his claim. The court found that qualified immunity was not properly invoked, right? That's correct. That's our issue, was it invoked or not. If it was invoked, do we decide or do we remand it to the district court? That's exactly right, Judge Clement, and because the district court erred in deciding that Mr. Romero did not properly invoke qualified immunity, this court may very simply reverse that order, remand it, allow the district court to rule on the merits. Mr. Romero complied with Rule 8C of the Rules of Civil Procedure. Under that rule, a defendant is required to plead an affirmative defense or a theory of avoidance to such a degree as to provide notice to the plaintiff that that defense or theory of avoidance has been invoked. The proof in this case that Mr. Romero properly invoked is the fact, as Chief Judge Stewart indicated earlier, was the fact that Mrs. Sines dedicated six pages in her response to the motion to dismiss, which are found on pages 1209 through 1214 of the court's record. She dedicated six pages of her response to the motion to dismiss addressing the merits of Mr. Romero's qualified immunity argument. She now alleges for the first time on appeal that Mr. Romero did not properly invoke. In fact, on page 1209 of the court's record, which is a page of Mrs. Sines' response to the motion to dismiss, she specifically says that Defendant Romero claims he is entitled to qualified immunity for his actions based on plaintiff's pleaded allegations. These are Mrs. Sines' words. She was unnoticed that Mr. Romero had invoked qualified immunity. With respect to the issue of posse comitatus, there is a firmly rooted history and tradition of affording qualified immunity. Counsel for appellee tries to draw a distinction between those individuals that are involved in the cases that we cited in our brief that assisted law interpretation of detainees that were afforded immunity. He tries to draw a distinction that those individuals only did that activity once. The Supreme Court, in fact, in Filarski v. Delia said that the court should not draw distinctions between whether the individuals involved in those public duties on a part-time or full-time basis. That's not the test. As long as you're acting as a joint actor and there's a firmly rooted history, which there is in this case, of qualified immunity, the court should grant immunity. For these reasons, again, we respectfully ask the court to reverse the district court and remand the case to allow the district court to rule on the merits. Thank you. Thank you, counsel, in this case. This ruling will be submitted. We'll stand at short recess while we reconstitute the panel.